FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2014 APR -2  PM 4: 51

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

| | |
|---|---|
| WHOLE WOMAN'S HEALTH; ABORTION ADVANTAGE; AUSTIN WOMEN'S HEALTH CENTER; KILLEEN WOMEN'S HEALTH CENTER; NOVA HEALTH SYSTEMS d/b/a REPRODUCTIVE SERVICES; SHERWOOD C. LYNN, JR., M.D.; PAMELA J. RICHTER, D.O.; LENDOL L. DAVIS, M.D.; and LAMAR ROBINSON, M.D., on behalf of themselves and their patients,<br><br>                     Plaintiffs,<br><br>v.<br><br>DAVID LAKEY, M.D., Commissioner of the Texas Department of State Health Services; MARI ROBINSON, Executive Director of the Texas Medical Board; DAVID ESCAMILLA, County Attorney for Travis County; JAIME ESPARZA, District Attorney for El Paso County; RENÉ GUERRA, Criminal District Attorney for Hidalgo County; JAMES E. NICHOLS, County Attorney for Bell County; SUSAN D. REED, Criminal District Attorney for Bexar County; JOE SHANNON, JR., Criminal District Attorney for Tarrant County; CRAIG WATKINS, Criminal District Attorney for Dallas County, in their official capacities,<br><br>                     Defendants. | CIVIL ACTION<br><br>CASE NO. **A 14 CV 0 284 LY** |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## I.      PRELIMINARY STATEMENT

1.      Pursuant to 42 U.S.C. § 1983, Plaintiffs, who are Texas health care providers, bring

this action on behalf of themselves and their patients.  They seek declaratory and injunctive relief from certain unconstitutional requirements imposed by Texas House Bill No. 2 ("the Act"), Act of July 18, 2013, 83rd Leg., 2nd C.S., ch. 1, Tex. Gen. Laws, and its implementing regulations, *see* 38 Tex. Reg. 6536-46 (Sept. 27, 2013) (notice of proposed rules); 38 Tex. Reg. 9577-93 (adoption of proposed rules). [1]

2.    The Act targets abortion providers for the imposition of unique regulatory burdens that are not imposed on any other health care providers in Texas, are inconsistent with accepted medical standards, impose costs that are far in excess of any potential benefits, and will dramatically reduce the number and geographic distribution of medical facilities in the State where women can access safe and legal abortion services.

3.    These regulatory burdens include the "admitting privileges requirement," which provides, in relevant part, that "[a] physician performing or inducing an abortion must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that is located not further than 30 miles from the location at which the abortion is performed or induced." Act, § 2 (codified at Tex. Health & Safety Code Ann. § 171.0031); 25 Tex. Admin Code §§139.53(c), 139.56(a).

4.    They also include the "ASC requirement," which provides, in relevant part, that "the minimum standards for an abortion facility must be equivalent to the minimum standards adopted under [Texas Health & Safety Code] Section 243.010 for ambulatory surgical centers." Act, § 4 (codified at Tex. Health & Safety Code Ann. § 245.010(a)); 25 Tex. Admin. Code § 139.40.

---

[1] A copy of the Act is attached hereto as Exhibit 1.  The pages of the Texas Register providing notice of the proposed regulations and their adoption are attached hereto as Exhibit 2.

5.   The Act was signed by Governor Rick Perry on July 18, 2013.

6.   Initially scheduled to take effect on October 29, 2013, the admitting privileges requirement was the subject of a pre-enforcement, facial challenge by a coalition of abortion providers, including some of the Plaintiffs in this case.  It was permanently enjoined by a judge of this Court on October 28, 2013, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 909 (W.D. Tex. 2013), but the U.S. Court of Appeals for the Fifth Circuit stayed that injunction on the evening of October 31, 2013, 734 F.3d 406, 419 (5th Cir. 2013), *motion to vacate denied*, 134 S. Ct. 506 (2013), and ultimately reversed the district court's judgment, ___ F.3d ___, 13-51008, 2014 WL 1257965 (5th Cir. Mar. 27, 2014).  The Fifth Circuit expressly noted that "[l]ater as-applied challenges" could be brought to "deal with subsequent, concrete constitutional issues."  *Id.* at * 2.

7.   Here, Plaintiffs Whole Woman's Health and Dr. Lynn challenge the admitting privileges requirement as applied to the licensed abortion facility operated by Whole Woman's Health in McAllen (the "McAllen clinic").  The McAllen clinic is currently the only licensed abortion facility in the Rio Grande Valley.  During the past ten years, over 14,000 abortions were performed at the McAllen clinic; only two of those patients needed to be transported from the clinic to a hospital.  The McAllen clinic has not been able to provide abortion services since the admitting privileges requirement took effect.

8.   Plaintiffs Nova Health Systems d/b/a Reproductive Services ("Reproductive Services") and Dr. Richter challenge the admitting privileges requirement as applied to the licensed abortion facility operated by Reproductive Services in El Paso (the "El Paso clinic").  The El Paso clinic is currently one of only two licensed abortion facilities located west of San Antonio.  During the past ten years, over 17,000 abortions were performed at the El Paso clinic;

3

not one of those patients needed to be transported from the clinic to a hospital. Absent injunctive relief from the admitting privileges requirement, the El Paso clinic will be forced to cease providing abortion services after May 13, 2014, when Dr. Richter's temporary admitting privileges at an El Paso-area hospital are set to expire.

9.    The ASC requirement is scheduled to take effect on September 1, 2014. *See* Act, § 4 (codified at Tex. Health & Safety Code Ann. § 245.010(a)).

10.    All plaintiffs challenge the ASC requirement on its face.

11.    In addition, Whole Woman's Health and Dr. Lynn challenge the ASC requirement as applied to the McAllen clinic, and Reproductive Services and Dr. Richter challenge the ASC requirement as applied to the El Paso clinic.

12.    Prior to the passage of the Act, there were over three dozen licensed abortion clinics in Texas. Since the admitting privileges requirement has taken effect, that number has dropped significantly. If the ASC requirement is permitted to take effect, there will be fewer than ten abortion clinics in the State, all clustered in eastern metropolitan areas, with no clinics west or south of San Antonio.

## II.    JURISDICTION AND VENUE

13.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3).

14.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

15.    Venue is appropriate under 28 U.S.C. § 1391(b)(1) because some Defendants reside in this district.

## III.    PLAINTIFFS

16.    Plaintiff Whole Woman's Health operates licensed abortion facilities in Austin, Fort

Worth, and San Antonio. In addition, it operates a licensed ASC in San Antonio. These medical facilities have provided high quality reproductive health care services, including abortion services, to Texas women for over a decade. Until the admitting privileges requirement took effect, Whole Woman's Health also operated licensed abortion facilities in Beaumont and McAllen. If the admitting privileges requirement were enjoined with respect to the McAllen clinic, Whole Woman's Health would immediately resume providing services at that location. Whole Woman's Health sues on behalf of itself and its patients.

17.    Plaintiff Sherwood C. Lynn, Jr., M.D., is a board-certified obstetrician-gynecologist ("ob-gyn") licensed to practice medicine in the State of Texas. He has over 35 years of experience providing reproductive health care, including abortion care. He serves as the Medical Director of Whole Woman's Health's licensed abortion facility and ASC in San Antonio, and he seeks to provide abortion services at the McAllen clinic. Although he has admitting privileges at a hospital in San Antonio, no hospital within 30 miles of the McAllen clinic will grant him admitting privileges. Dr. Lynn sues on behalf of himself and his patients.

18.    Plaintiff Abortion Advantage operates a licensed abortion facility in Dallas. It has provided high quality reproductive health care services, including abortion services, to Texas women for over 25 years. Abortion Advantage sues on behalf of itself and its patients.

19.    Plaintiff Lamar Robinson, M.D., is an ob-gyn licensed to practice medicine in the State of Texas. He has over 28 years of experience providing reproductive health care, including abortion care. He currently serves as the Medical Director of Abortion Advantage. Dr. Robinson sues on behalf of himself and his patients.

20.    Plaintiffs Austin Women's Health Center and Killeen Women's Health Center (collectively, the "Health Centers") operate licensed abortion facilities in Austin and Killeen,

respectively.  These medical facilities have provided high quality reproductive health care services, including abortion services, to Texas women for over 35 years.  The Health Centers sue on behalf of themselves and their patients.

21.    Plaintiff Lendol L. "Tad" Davis, M.D., is a board-certified ob-gyn licensed to practice medicine in the State of Texas.  He has over 35 years of experience providing reproductive health care, including abortion care.  He serves as the Medical Director of Austin Women's Health Center and Killeen Women's Health Center.  Dr. Davis sues on behalf of himself and his patients.

22.    Plaintiff Nova Health Systems d/b/a Reproductive Services ("Reproductive Services") operates a licensed abortion facility in El Paso.  The El Paso clinic has provided high-quality reproductive health care services, including abortion services, to Texas women for over 35 years.  If the admitting privileges requirement is not enjoined prior to May 14, 2014, then the El Paso clinic will be forced to close on that date.  Reproductive Services sues on behalf of itself and its patients.

23.    Plaintiff Pamela J. Richter, D.O., is a board-eligible family medicine doctor licensed to practice medicine in the State of Texas.  She has been providing reproductive health care, including abortion care, for over 20 years. She currently serves as Medical Director of the El Paso clinic. Dr. Richter has temporary admitting privileges at Foundation Surgical Hospital of El Paso, which will expire on May 13, 2014.  No hospital within 30 miles of the El Paso clinic will grant Dr. Richter admitting privileges that are effective after May 13, 2014.   She sues on behalf of herself and her patients.

IV.    DEFENDANTS

24.    Defendant David Lakey, M.D., is the Commissioner of the Texas Department of State Health Services ("the Department" or "DSHS").  The Department is generally charged with

enforcement of the provisions of the Act challenged here.  Commissioner Lakey is sued in his official capacity and may be served with process at 1100 West 49th Street, Austin, Texas 78756-3199.

25.    Defendant Mari Robinson is the Executive Director of the Texas Medical Board ("the Board"). The Board is empowered to undertake disciplinary proceedings against a physician who violates certain requirements of the Act. Ms. Robinson is sued in her official capacity and may be served with process at 333 Guadalupe, Tower 3, Suite 610, Austin, Texas 78701.

26.    Defendant David Escamilla is the County Attorney for Travis County.  He is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in Travis County.  He is sued in his official capacity and may be served with process at 314 West 11th Street, Room 300, Austin, Texas 78701.

27.    Defendant Jaime Esparza is the District Attorney for El Paso County.  He is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in El Paso County.  He is sued in his official capacity and may be served with process at El Paso County Courthouse, 500 East San Antonio Avenue, Room 201, El Paso, Texas 79901-2419.

28.    Defendant René Guerra is the Criminal District Attorney for Hidalgo County.  He is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in Hidalgo County.  He is sued in his official capacity and may be served with process at 100 North Closner Blvd., Room 303, Edinburg, Texas 78539-3563.

29.    Defendant James E. Nichols is the County Attorney for Bell County.  He is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in

Bell County. He is sued in his official capacity and may be served with process at the Bell County Justice Center, 1201 Huey Road, Belton, Texas 76513.

30.     Defendant Susan D. Reed is the Criminal District Attorney for Bexar County. She is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in Bexar County. She is sued in her official capacity and may be served with process at 101 West Nueva Street, 4th Floor, San Antonio, Texas 78205-3406.

31.     Defendant Joe Shannon, Jr. is the Criminal District Attorney for Tarrant County. He is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in Tarrant County. He is sued in his official capacity and may be served with process at the Tim Curry Criminal Justice Center, 401 West Belknap Street, Fort Worth, Texas 76196-0201.

32.     Defendant Craig Watkins is the Criminal District Attorney for Dallas County. He is responsible for prosecuting misdemeanors, including criminal violations of the Act, occurring in Dallas County. He is sued in his official capacity and may be served with process at 133 North Riverfront Boulevard, LB 19, Dallas, Texas 75207.

## V.     FACTUAL ALLEGATIONS

### A.     The Admitting Privileges Requirement

#### Overview

33.     The admitting privileges requirement provides, *inter alia*, that "[a] physician performing or inducing an abortion must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that is located not further than 30 miles from the location at which the abortion is performed or induced." Act, § 2 (codified at Tex. Health & Safety Code Ann. § 171.0031); 25 Tex. Admin. Code §§ 139.53(c), 139.56(a).

34.     Any physician who violates this requirement commits a Class A misdemeanor offense. The physician is also subject to license revocation, and the abortion facility at which the

abortion is performed is subject to license revocation. *See* Tex. Health & Safety Code § 171.0031; Tex. Occ. Code § 164.055(a); 25 Tex. Admin. Code § 139.32.

35.    Prior to the enactment of the admitting privileges requirement, Texas law required that: "A licensed abortion facility shall have a readily accessible written protocol for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital. The facility shall ensure that the physicians who practice at the facility have admitting privileges or have a working arrangement with a physician(s) who has admitting privileges at a local hospital in order to ensure the necessary back up for medical complications." 25 Tex. Admin. Code § 139.56(a) (2012).

36.    This regulation had been in effect since 2009 and had never been challenged in litigation.

37.    Both the McAllen clinic and the El Paso clinic were in compliance with this regulation when the admitting privileges requirement was enacted.

38.    Both the McAllen clinic and the El Paso clinic continue to have a readily accessible written protocol for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital.

39.    Both the McAllen clinic and the El Paso clinic continue to ensure that the physicians who practice at the respective facilities have a working arrangement with at least one physician who has admitting privileges at a local hospital.

40.    The admitting privileges requirement effectively gives local hospitals veto power over the McAllen clinic's ability to provide abortion care to women in the Rio Grande Valley and the El Paso clinic's ability to provide abortion care to women in West Texas. Hospitals in Texas have broad discretion to set the criteria for granting admitting privileges and can thereby

grant or refuse privileges on the basis of idiosyncratic rules and regulations. *See* Tex. Health & Safety Code § 241.101.

41.    Hospitals within Texas have varying requirements for admitting privileges.  Some require a certain number of patient admissions each year; some require physicians to reside within a certain distance from the hospital; others limit admitting privileges to physicians who are directly employed by or under contract with the hospital; while others require a physician to designate an alternate physician with admitting privileges at the hospital who is willing to co-sign the application. These criteria, unrelated to a physician's ability to provide high-quality abortion care, may preclude physicians from obtaining admitting privileges at a local hospital.

**The McAllen Clinic's Inability to Comply with the Admitting Privileges Requirement**

42.    After the admitting privileges requirement was enacted, four physicians affiliated with Whole Woman's Health, including Dr. Lynn, sought to obtain admitting privileges at a hospital within 30 miles of the McAllen clinic.  Each physician is a board-certified ob-gyn and experienced abortion provider, and three of the four have admitting privileges at hospitals in other parts of the State.

43.    None was able to obtain admitting privileges at a hospital within 30 miles of the McAllen clinic.

44.    There are eight hospitals located within 30 miles of the McAllen clinic.  Each of them requires, as a condition of granting admitting privileges, that an application be signed by a "designated alternate" physician willing to attend to the applicant's patients when the applicant is unavailable.  The designated alternate physician must already have admitting privileges at the hospital.  If an application is not signed by a designated alternate physician, it will not be considered, regardless of whether the applicant meets the hospital's other requirements.

45.     Only one eligible physician was willing to serve as a designated alternate physician for the physicians affiliated with the McAllen clinic, and this physician only has privileges at one area hospital: Doctors Hospital at Renaissance.  The other physicians approached by the clinic expressed concern about retaliation from the hospitals at which they had admitting privileges and the possibility that their privileges would be revoked or discontinued if they facilitated the application of a known abortion provider.

46.     Thus, the physicians affiliated with the McAllen clinic were only able to satisfy the application criteria for Doctors Hospital at Renaissance.   At this hospital, the first step in applying for admitting privileges is to submit a written request for an application.

47.     In September 2013, all four physicians submitted such requests.

48.     In November or December 2013, each of the physicians received a letter in response stating that, based on the recommendation of the hospital's Credentials Committee, the Medical Executive Committee was denying the physician's request for an application for privileges.  Each letter further stated that the Board of Governors had considered the request and determined not to extend an application "as authorized under the Bylaws and Rules and Regulations of the Medical Staff for the Hospital" and that the "decision of the Governing Body was not based on clinical competence consideration."  The letters provided no other explanation as to why each of the four physicians was denied the opportunity to apply for admitting privileges at the hospital.

49.     Whole Woman's Health has been unable to recruit a physician with admitting privileges at a hospital within 30 miles of the McAllen clinic to provide abortion services at the clinic.

**Challenges Facing Women in the Rio Grande Valley Who Seek Abortion Care**

50.    In 2010, the latest year for which DSHS data is available, 2,845 women from the Rio Grande Valley had abortions in Texas.  *See* Texas Dep't of State Health Servs., Table 35: Induced Terminations of Pregnancy by County of Residence and Race/Ethnicity, http://www.dshs.state.tx.us/chs/vstat/vs10/t35.shtm (last accessed April 1, 2014).

51.    The McAllen clinic is currently the only licensed abortion facility in the Rio Grande Valley.

52.    Absent as-applied relief from the Court, the McAllen clinic will be unable to resume its provision of medical services, leaving women in the Rio Grande Valley without an abortion provider in their region. The closest abortion provider would be in Corpus Christi, which is over 150 miles from McAllen.

53.    For many women in the Rio Grande Valley, a 150-mile distance is a substantial obstacle to accessing abortion care.

54.    The Rio Grande Valley is comprised of four counties along the eastern border of Texas and Mexico:  Starr County, Hidalgo County, Willacy County, and Cameron County.  It has a population of approximately 1.3 million.[2]

55.    There are some urban centers in the Rio Grande Valley—for example, in McAllen, Harlingen, and Brownsville—but much of the region is rural.  The rural areas include unincorporated towns known as *colonias*, which are more prevalent in the Rio Grande Valley than anywhere else in the United States. *Colonias* can be hard to reach because they often do not

---

[2] U.S. Census Bureau, Population Div., Annual Estimates of the Resident Population: Apr. 1, 2010 to July 1, 2012 (2010), http://factfinder2.census.gov/bkmk/table/1.0/en/PEP/2012/PEPANNRES/0500000US48061|050 0000US48215|0500000US48427|0500000US48489 (last accessed April 1, 2014).

12

appear on maps.   In many *colonias*, residents have a difficult time accessing basic public services, including water, electricity, sewage and drainage systems and paved roads.   *See* Federal Reserve Bank of Dallas, *Texas Colonias: A Thumbnail Sketch of the Conditions, Issues, Challenges and Opportunities* (2007),   http://www.dallasfed.org/assets/documents/cd/pubs/ colonias.pdf.

56.     The vast majority of people living in the Rio Grande Valley are Latino.[3]  Latinos in Texas are three times as likely to live in poverty as white people.[4]  Overall, approximately one-third of the population in the Rio Grande Valley lives in poverty.[5]

57.     Nearly half of the population has less than a ninth-grade education,[6] and the region has a high proportion of farmworkers and seasonal migrant workers.  Employment outside of the agricultural field, especially for uneducated and unskilled workers, is scarce.   As a result, unemployment in the Rio Grande Valley is higher than in the rest of the State.[7]

58.     Most of the Rio Grande Valley is designated as a medically underserved area by

---

[3] U.S. Census Bureau, Population Div., ACS Demographic and Housing Estimates, 2009-2011 (2007-2011),   http://factfinder2.census.gov/bkmk/table/1.0/en/ACS/11_5YR/DP05/0500000 US48061|0500000US48215|0500000US48427|0500000US48489 (last accessed April 1, 2014).

[4] KFF, Poverty Rate by Race/Ethnicity (2010-2011), http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/ (last accessed April 1, 2014).

[5] U.S. Census Bureau, Poverty Status in the Past 12 Months (2009-2011), http://factfinder2.census.gov/bkmk/table/1.0/en/ACS/11_3YR/S1701/0500000US48061|0500000 US48215|0500000US48427|0500000US48489 (last accessed April 1, 2014).

[6] U.S. Census Bureau, Educational Attainment –2009-2011 American Community Survey 3-year Estimates, 2009 – 2011 (2009-2011), http://factfinder2.census.gov/bkmk/table/1.0/en/ACS/ 11_3YR/S1501/0500000US48061|0500000US48215|0500000US48427|0500000US48489  (last accessed April 1, 2014).

[7] U.S. Census Bureau, Employment Status – 2009-2011 American Community Survey 3-Year Estimates, 2009–2011 (2009-2011), http://factfinder2.census.gov/bkmk/table/1.0 /en/ACS/11_5YR/S2301/0400000US48|0500000US48061|0500000US48215|0500000US48427| 0500000US48489 (last accessed April 1, 2014).

the federal government because the population has a shortage of health services and faces numerous socioeconomic barriers to health care access. *See* Texas Dep't of State Health Servs., *MUA and MUP Designations*, http://www.dshs.state.tx.us/CHS/hprc/MUAlist.shtm (last updated April 10, 2012).

59.   Women living in the Rio Grande Valley face many challenges in accessing reproductive health care services generally and abortion care specifically.   These challenges include poverty, lack of service providers, lack of access to transportation, need for childcare, and inability to take time off from work.

60.   Many women in the Rio Grande Valley rely on State-subsidized health clinics for preventative reproductive health care, such as pap smears and contraceptives.   In 2011, the number of these clinics was dramatically reduced as a result of changes in State law.   Few of them remain in the Rio Grande Valley, and demand for their services now exceeds their capacity. As a result, women must endure long waits for appointments, and some simply live too far from the nearest clinic to access services.   The reduction in State-subsidized clinics has had a devastating impact on women's ability to access preventative reproductive health care.

61.   As a result, it is now much harder for women in the Rio Grande Valley to avoid unwanted pregnancies.   Many women do not want to have additional children, but they no longer have access to affordable contraceptives and cannot afford the cost of a sterilization procedure. *See* Center for Reproductive Rights & National Latina Institute for Reproductive Health, *Nuestra Voz, Nuestra Salud, Nuestro Texas: The Fight for Women's Reproductive Health in the Rio Grande Valley* (2013), *available at* http://www.nuestrotexas.org/ pdf/NT-spread.pdf (last accessed April 1, 2014).

62.   The obstacles preventing women in the Rio Grande Valley from accessing

preventative services at non-local clinics will likewise prevent women from accessing abortion services at non-local clinics.

63.    As a result, women in the Rio Grande Valley are left with few options for controlling the number and spacing of their children.

## The El Paso Clinic's Inability to Comply with the Admitting Privileges Requirement after May 13, 2014

64.    After the admitting privileges requirement was enacted, Dr. Richter sought to obtain admitting privileges at a hospital within 30 miles of the El Paso Clinic.  She is the Medical Director of the clinic and the only physician who provides abortion services there.

65.    In addition to her work at the El Paso clinic, Dr. Richter also works for the State of Texas.  She serves as a staff physician at the state supported living center ("State Center") in El Paso operated by the Texas Department of Aging and Disability Services ("DADS").  The State Center provides 24-hour residential services, comprehensive behavioral treatment services, vocational and rehabilitation services, and general health care services to people with intellectual and developmental disabilities.

66.    Previously, from 1990 to 2001, Dr. Richter maintained a family medicine practice in El Paso.

67.    From January 1990 to May 2003, Dr. Richter had admitting privileges at Del Sol Medical Center, which is located within 30 miles of the El Paso clinic.  One of the criteria for maintaining admitting privileges at that hospital is admitting a minimum number of patients to the hospital each year.  After Dr. Richter closed her private practice in 2001, she was no longer able to admit the requisite number of patients to the hospital.  As a result, when her privileges came up for renewal in 2003, they were not renewed.

68.    Subsequent to the enactment of the admitting privileges requirement, one hospital

within 30 miles of the El Paso clinic granted Dr. Richter temporary admitting privileges, effective through May 13, 2014.  To date, no hospital within 30 miles of the El Paso clinic has been willing to grant Dr. Richter admitting privileges that are effective after May 13, 2014.

69.    Reproductive Services has been unable to recruit a physician with admitting privileges at a hospital within 30 miles of the El Paso clinic to provide abortion services at the clinic.

### Challenges Facing Women in West Texas Who Seek Abortion Care

70.    Currently, the El Paso clinic is one of only two licensed abortion facilities west of San Antonio.

71.    Absent as-applied relief from the Court, the El Paso clinic will be forced to stop providing abortion services after May 13, 2014, leaving a huge region of the State with only a single abortion provider.  Women unable to get an appointment with that provider would have to travel to San Antonio to obtain abortion services.  San Antonio is over 550 miles from El Paso.

72.    For many women in West Texas, a 550-mile distance is a substantial obstacle to accessing abortion care.

73.    West Texas is a vast region with numerous, largely rural, counties.

74.    The "Trans-Pecos" region of West Texas is comprised of nine counties: Brewster, Culberson, El Paso, Hudspeth, Jeff Davis, Pecos, Presidio, Reeves, and Terrell.  Approximately 877,000 people live in these counties, and over 80% of them are Latino.  The region has high levels of poverty: 24% of the population as a whole, and 27% of the Latino population, live below the poverty line.  Nearly one-third of the population has a household income less than $25,000 a year. *See* Institute for Demographic and Socioeconomic Research, TxDOT Data Analysis Tool, at http://idserportal.utsa.edu/txDoT/OneStop/Output.aspx?id=8137&tp

=single&l=11 (aggregate data for Brewster, Culberson, El Paso, Hudspeth, Jeff Davis, Pecos, Presidio, Reeves, and Terrell counties) (last accessed April 1, 2014).

75.    Most of the Trans-Pecos region is designated as a medically underserved area by the federal government. *See* Texas Dep't of State Health Servs., *MUA and MUP Designations*, http://www.dshs.state.tx.us/CHS/hprc/MUAlist.shtm (last updated April 10, 2012).

76.    In 2010, the latest year for which DSHS data is available, 2,278 women in the Trans-Pecos region had abortions in Texas; 2,216 of them were from El Paso County. *See* Texas Dep't of State Health Servs., Table 35: Induced Terminations of Pregnancy by County of Residence and Race/Ethnicity, http://www.dshs.state.tx.us/chs/vstat/vs10/t35.shtm (last accessed April 1, 2014).

77.    If the El Paso clinic closes, the other licensed abortion facility in the region would not be able to meet patient demand for services.  As a result, some women would have to endure long waits for an appointment, and other women would be turned away.

### Safety of Abortion Care at the McAllen and El Paso Clinics

78.    As applied to the McAllen and El Paso clinics, the admitting privileges requirement does not advance the State's interest in women's health.

79.    There are generally two methods of performing abortions in the United States: surgical abortion, which involves the use of medical instruments to evacuate the contents of the uterus; and medical abortion, which involves the administration of medications that cause the termination of a pregnancy.

80.    Both types of abortion are extremely safe.  The mortality rate from use of penicillin is roughly three times higher than the mortality rate from abortion, and the mortality rate from childbirth is roughly 14 times higher.  Serious complications from abortion are rare and hardly

ever require hospitalization.

81.     The types of abortions performed at the McAllen and El Paso clinics are among the safest of all abortion procedures.

82.     While abortion is extremely safe throughout pregnancy, a woman's risk of experiencing an abortion-related complication increases with the gestational age of her pregnancy.  Therefore, earlier abortions have less risk of complications.

83.     The McAllen clinic provided abortion services prior to 16 weeks of pregnancy. The highest level of sedation offered to patients at the McAllen clinic was moderate sedation/analgesia, also known as conscious sedation.

84.     The El Paso clinic provides abortion services prior to 16 weeks of pregnancy.  The highest level of sedation offered to patients at the El Paso clinic is minimal sedation/analgesia.

85.     During the past ten years, the McAllen clinic only had to transfer two patients from the clinic to a hospital.  Over 14,000 abortions were performed there during that period.

86.     During the past ten years, the El Paso clinic has not had to transfer any patients from the clinic to the hospital.  Over 17,000 abortions were performed there during that period.

**Accepted Medical Standards for Outpatient Practice**

87.     The admitting privileges requirement is inconsistent with accepted medical standards.

88.     In Texas, physicians and other licensed medical practitioners provide a variety of surgical and non-surgical procedures in outpatient settings, some of which are comparable in safety to abortion and some of which entail far greater risks than abortion.  Yet only physicians providing abortion services are required to have admitting privileges at a local hospital.

89.     Moreover, Texas law does not require any type of medical facility besides abortion

clinics to employ physicians with admitting privileges as a condition of licensure.   The regulations governing freestanding emergency medical care facilities and end stage renal disease facilities require only that a facility have a transfer agreement with a hospital.  *See* 25 Tex. Admin. Code §§ 131.52(s), 131.66, 131.67 (freestanding emergency medical care facilities); 25 Tex. Admin Code § 117.45(b)(4) (end stage renal disease facilities).  The regulations governing ambulatory surgical centers ("ASCs") permit a facility to maintain a transfer agreement with a hospital as an alternative to employing physicians with admitting privileges.  *See* 25 Tex. Admin. Code § 135.4(c)(11)(B).   And, the regulations governing birthing centers and special care facilities for the treatment of terminally ill patients require only that a facility has a plan for managing patient emergencies.  *See* 25 Tex. Admin. Code § 137.46 (birthing centers); 25 Tex. Admin. Code § 125.32(a)(3) (special care facilities).

90.   Moreover, the nation's leading medical associations and accreditation bodies— including the American Medical Association ("AMA"), the American College of Obstetricians and Gynecologists ("ACOG"), the American College of Surgeons ("ACS"), the American Society of Anesthesiologists ("ASA"), the Accreditation Association for Ambulatory Health Care ("AAAHC"), the American Association for Accreditation of Ambulatory Surgery Facilities (AAAASF"), and the Joint Commission (formerly the Joint Commission on Accreditation of Healthcare Organizations or "JCAHO")—recognize that admitting privileges at a local hospital are not required for the safe performance of outpatient procedures.

91.   In connection with the facial challenge to the admitting privileges requirement, the AMA and ACOG filed a brief in the Fifth Circuit explaining that admitting privileges at a local hospital are not required for the safe performance of abortion procedures in outpatient settings and are not part of the standard of care.  *See* Br. of *Amicus Curiae* Am. Coll. of Obstetricians &

Gynecologists and Am. Med. Ass'n, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, ___ F.3d ___ (5th Cir. Mar. 27, 2014) (No. 13-51008), 2013 WL 6837500.

92.   ACOG, ACS, and ASA have all issued guidelines concerning outpatient surgery. None requires that physicians performing outpatient surgery have admitting privileges at a local hospital.

93.   The National Abortion Federation ("NAF") Clinical Policy Guidelines do not require physicians performing or supervising abortions to have admitting privileges at a local hospital.

94.   Of the three major national organizations that accredit healthcare facilities— AAAHC, AAAASH, and the Joint Commission—none requires an outpatient facility to employ physicians with admitting privileges as a condition of accreditation.

95.   In the rare event that a patient who has had an abortion requires hospitalization, the quality of care that she receives at the hospital will not be affected by whether her abortion provider has admitting privileges there. Upon the patient's arrival at the hospital via ambulance, an emergency room physician will evaluate the patient and consult with other specialists at the hospital as needed. The patient may require admission to the hospital, or she may simply be treated in the emergency room and then released. Either way, continuity of care can be maintained by direct telephone communication between the abortion provider and the emergency room physician, regardless of whether the abortion provider has admitting privileges at the hospital.

96.   Physicians practicing in outpatient settings often refer patients for treatment at hospitals at which they do not have admitting privileges. This is standard medical practice.

97.   In fact, the trend in medicine is toward bifurcation of outpatient practice and

hospital-based practice, such that physicians are increasingly specializing in one type of practice setting or the other.  Coordination and continuity of care of a patient that is transferred from an outpatient setting to a hospital are achieved through communication between the physician referring the patient to the hospital and the physician treating the patient at the hospital.

<u>**Futility of the Admitting Privileges Requirement As Applied to the McAllen and El Paso Clinics**</u>

98.    Many complications from abortion arise only after a patient has left the clinic and returned home.  This is almost always true of complications arising from medical abortions because the medications used to induce those abortions take time to exert their effects.

99.    If a patient experiences a serious complication after she has left the clinic and returned home, the appropriate course of action would be for her to go to the nearest emergency room.

100.    By forcing the McAllen and El Paso clinics to close, the admitting privileges requirement would require all women in the Rio Grande Valley and many women in West Texas to travel hundreds of miles from their homes to access abortion services, guaranteeing that each of those women would be hundreds of miles from the facility at which her abortion was performed if she experienced a serious complication after she returned home.  Thus, the admitting privileges requirement does not make it more likely that women from the Rio Grande Valley or West Texas who experience abortion-related complications would be treated at a hospital where their abortion-provider has admitting privileges.

101.    As applied to the McAllen and El Paso clinics, the admitting privileges requirement is therefore futile.

<u>**Harms to Women in the Rio Grande Valley and West Texas Caused by the Admitting Privileges Requirement**</u>

102.    By sharply restricting their access to safe and legal abortion services, the

admitting privileges requirement puts the health of women in the Rio Grande Valley and West Texas at risk.

103.   As a result of the admitting privileges requirement, some women will be delayed in accessing abortion care, some will be forced to carry an unwanted pregnancy to term, and some will attempt to self-induce abortion.  Each of these courses of action is riskier than having an abortion at the McAllen or El Paso clinic without delay.

104.   Although abortion is very safe throughout pregnancy, the risks of experiencing an abortion-related complication increase with gestational age.  As a result, women who are delayed in accessing abortion services are subject to greater health risks than women who are not delayed.

105.   Women who are unable to obtain abortion services must instead carry their pregnancies to term and give birth.  These women are also subject to increased health risks because the risk of death from childbirth is 14 times higher than the risk of death from abortion.

106.   Additionally, some women who cannot access legal abortion services will instead attempt self-induction of abortion.   Prior to the enactment of the admitting privileges requirement, self-abortion was already practiced by women in the Rio Grande Valley and West Texas who were desperate to end a pregnancy but did not have the means to obtain abortion services at a licensed clinic.

107.   During the four-month period of time when the McAllen clinic was open but not providing abortion services, clinic staff members encountered a larger number of prospective patients who had attempted self-abortion.  These women utilized a variety of methods, including herbal teas, douches, physical trauma to the abdomen, and medications purchased on the black market.

108.   Many women are aware that misoprostol can be used to induce an abortion.  This medication is available over-the-counter in Mexico and is widely trafficked in the Rio Grande Valley and West Texas, which both border Mexico.  It is also sold on the internet.

109.   Like any medication obtained on the black market, misoprostol obtained in this way can be counterfeit, inappropriate for a particular woman's medical needs, or used incorrectly because a woman does not have adequate information.

110.   Self-induction of abortion is less safe than abortion performed by a trained medical practitioner.

111.   In addition to abortion services, the McAllen clinic provided other gynecological and family planning services, such as diagnosis and treatment of sexually transmitted infections, contraceptive counseling and provision, pregnancy testing, and diagnosis and treatment of abnormal pap smears.  The McAllen clinic also provided assistance, including counseling and referrals, to pregnant women interested in adoption.

112.   Without the revenue generated from providing abortion services, the McAllen clinic was unable to sustain the remainder of its practice after the admitting privileges requirement took effect.  As a result, it is no longer able to provide these other services to women in the Rio Grande Valley.

113.   In addition to abortion services, the El Paso clinic provides other gynecological and family planning services, such as annual well-woman examinations, which include pelvic examinations, pap smears, and breast examinations; testing and treatment for STIs; provision of contraceptives; and pregnancy testing.  The El Paso clinic also works with an affiliated adoption agency to help interested women place their children for adoption.

114.   If the El Paso clinic is forced by the admitting privileges requirement to stop

providing abortion services, it would have to close, and would therefore be unable to provide these other services to women in West Texas.

**B.     The ASC Requirement**

115.    The ASC requirement provides that "[o]n or after September 1, 2014, the minimum standards for an abortion facility must be equivalent to the minimum standards . . . for ambulatory surgical centers." Act, § 4 (codified at Tex. Health & Safety Code Ann. § 245.010(a)); 25 Tex. Admin. Code § 139.40.

116.    Failure to comply with those standards may give rise to criminal, civil, and administrative penalties.   Tex. Health & Safety Code Ann. §§ 245.014 (criminal penalties), 245.015 (civil penalties), 245.017 (administrative penalties).  It may also result in the denial, suspension, probation, or revocation of an abortion facility license.  Tex. Health & Safety Code Ann. § 245.012.

117.    Independently of the Act, Texas law requires that "[a]n abortion of a fetus age 16 weeks or more may be performed only at an ambulatory surgical center or hospital licensed to perform the abortion." Tex. Health & Safety Code Ann. §171.004.  Plaintiffs do not challenge this requirement, which would remain in effect if the Act and its implementing regulations were enjoined.

118.    The ASC requirement will force all licensed abortion facilities to meet detailed physical plant requirements, which specify, among other things, hallway widths; ceiling heights; area of various rooms; floor, wall, and ceiling finishes; HVAC system requirements; and number and configuration of bathrooms, janitorial closets, and parking spaces. *See* 25 Tex. Admin. Code § 139.40 (incorporating by reference, *inter alia*, 25 Tex. Admin. Code § 135.52).

119.    An ASC is far more expensive to acquire and operate than a health care facility that meets existing abortion facility standards.

24

120. The licensed abortion facilities operated by Whole Woman's Health in Austin, Fort Worth, and San Antonio do not meet the minimum standards for ASCs. Likewise, the McAllen clinic does not meet the minimum standards for ASCs.

121. The licensed abortion facility operated by Abortion Advantage does not meet the minimum standards for ASCs.

122. The licensed abortion facilities operated by the Health Centers do not meet the minimum standards for ASCs.

123. The El Paso clinic does not meet the minimum standards for ASCs.

124. If the ASC requirement is permitted to take effect, there would be fewer than ten facilities in the State that are permitted to provide abortion services ("abortion-care ASCs"). Those facilities would be clustered in eastern metropolitan areas. There would be no abortion-care ASCs west or south of San Antonio.

125. The closest abortion-care ASC to McAllen would be in San Antonio, over 235 miles away. The closest abortion-care ASC to El Paso would also be in San Antonio, over 550 miles away.

126. Requiring licensed abortion facilities to meet the minimum standards for ASCs will not enhance the safety of abortion procedures. It will only reduce the availability of abortion services, and thereby threaten the health of women seeking abortion services.

127. Apart from abortion procedures, Texas law does not require any other outpatient surgical or medical procedures to be performed in an ASC.

128. Many procedures commonly performed in outpatient settings are comparable to surgical abortion in terms of risks, invasiveness, instrumentation, and duration. These include gynecological procedures such as dilation and curettage ("D&C") and non-gynecological

procedures such as colonoscopy. Texas law does not require the facilities in which these procedures are performed to meet the minimum standards for ASCs.

129.    Procedures that are more complex than abortion and entail greater risks of morbidity and mortality are also commonly performed in outpatient settings, including gynecological procedures such as laparoscopy and vaginal hysterectomy and non-gynecological procedures such as plastic surgery and bariatric surgery. These procedures are usually performed while the patient is under general anesthesia, which by itself is much riskier than abortion. Texas law does not require the facilities in which these procedures are performed to meet the minimum standards for ASCs.

130.    Moreover, Texas law does not require outpatient birthing centers to meet the minimum standards for ASCs. *See* Tex. Health & Safety Code Ann. § 244.010; 25 Tex. Admin Code §§ 137.1-137.55. But childbirth entails far more medical risks than abortion. As stated above, the risk of death from childbirth is approximately 14 times higher than the risk of death from abortion.

131.    Certain characteristics of surgical abortion procedures render many of the minimum standards for ASCs inappropriate. For example, like other surgical procedures involving entry into the respiratory, alimentary, genital, or urinary tracts, surgical abortion procedures involve a clean-contaminated surgical site. Further, surgical abortion procedures do not entail an incision into the body; instead, they entail insertion of instruments into a body cavity through a natural orifice. In this respect, surgical abortion is analogous to insertion of a catheter.

132.    Medical abortion does not involve surgery of any kind. As practiced in Texas, it entails the oral administration of medications—*i.e.*, the patient merely swallows a series of

tablets.

133.   The ASC requirement will not advance the State's interest in women's health.

134.   The ASC requirement will not increase the safety of surgical abortion.

135.   The ASC requirement will not increase the safety of medical abortion.

136.   By reducing the number and geographic distribution of abortion providers in Texas, the ASC requirement will place substantial obstacles in the path of Texas women seeking abortion services and will expose those women to increased health risks.

137.   These obstacles and risks will be greatest for women living in the Rio Grande Valley and West Texas.

## CLAIMS FOR RELIEF

### COUNT I
### (Undue Burden/Admitting Privileges Requirement)

138.   The allegations of paragraphs 1 through 137 are incorporated as though fully set forth herein.

139.   As applied to the McAllen clinic, the admitting privileges requirement—standing alone and in conjunction with burdens imposed by other provisions of Texas law—imposes an undue burden on the right of women in the Rio Grande Valley to terminate a pregnancy prior to viability in violation of the Due Process Clause of the Fourteenth Amendment.

140.   As applied to the El Paso clinic, the admitting privileges requirement—standing alone and in conjunction with burdens imposed by other provisions of Texas law—imposes an undue burden on the right of women in West Texas to terminate a pregnancy prior to viability in violation of the Due Process Clause of the Fourteenth Amendment.

### COUNT II
### (Equal Protection/Admitting Privileges Requirement)

141.   The allegations of paragraphs 1 through 140 are incorporated as though fully set

27

forth herein.

142.    As applied to the McAllen clinic, the admitting privileges requirement denies equal protection of the laws to Whole Woman's Health, Dr. Lynn, and their patients in the Rio Grande Valley in violation of the Equal Protection Clause of the Fourteenth Amendment.

143.    As applied to the El Paso clinic, the admitting privileges requirement denies equal protection of the laws to Reproductive Services, Dr. Richter and their patients in West Texas in violation of the Equal Protection Clause of the Fourteenth Amendment.

**COUNT III**
**(Unlawful Delegation/Admitting Privileges Requirement)**

144.    The allegations of paragraphs 1 through 143 are incorporated as though fully set forth herein.

145.    The admitting privileges requirement improperly delegates lawmaking authority to hospitals located within 30 miles of the McAllen clinic in violation of the Due Process Clause of the Fourteenth Amendment.

146.    The admitting privileges requirement improperly delegates lawmaking authority to hospitals located within 30 miles of the El Paso clinic in violation of the Due Process Clause of the Fourteenth Amendment.

**COUNT IV**
**(Arbitrary & Unreasonable State Action/Admitting Privileges Requirement)**

147.    The allegations of paragraphs 1 through 146 are incorporated as though fully set forth herein.

148.    As applied to the McAllen clinic, the admitting privileges requirement constitutes arbitrary and unreasonable State action in violation of the Due Process Clause of the Fourteenth Amendment.

149.    As applied to the provision of medical abortion at the McAllen clinic, the

admitting privileges requirement constitutes arbitrary and unreasonable State action in violation of the Due Process Clause of the Fourteenth Amendment.

150.    As applied to the El Paso clinic, the admitting privileges requirement constitutes arbitrary and unreasonable State action in violation of the Due Process Clause of the Fourteenth Amendment.

151.    As applied to the provision of medical abortion at the El Paso clinic, the admitting privileges requirement constitutes arbitrary and unreasonable State action in violation of the Due Process Clause of the Fourteenth Amendment.

**COUNT V**
**(Undue Burden/ASC Requirement)**

152.    The allegations of paragraphs 1 through 151 are incorporated as though fully set forth herein.

153.    The ASC requirement—standing alone and in conjunction with burdens imposed by other provisions of Texas law—imposes an undue burden on the right of women in Texas to terminate a pregnancy prior to viability in violation of the Due Process Clause of the Fourteenth Amendment.

154.    As applied to the McAllen clinic, the ASC requirement—standing alone and in conjunction with burdens imposed by other provisions of Texas law—imposes an undue burden on the right of women in the Rio Grande Valley to terminate a pregnancy prior to viability in violation of the Due Process Clause of the Fourteenth Amendment.

155.    As applied to the El Paso clinic, the ASC requirement—standing alone and in conjunction with burdens imposed by other provisions of Texas law—imposes an undue burden on the right of women in West Texas to terminate a pregnancy prior to viability in violation of the Due Process Clause of the Fourteenth Amendment.

## COUNT VI
### (Equal Protection/ASC Requirement)

156.    The allegations of paragraphs 1 through 155 are incorporated as though fully set forth herein.

157.    The ASC requirement denies equal protection of the laws to Plaintiffs and their patients in violation of the Equal Protection Clause of the Fourteenth Amendment.

## COUNT IV
### (Arbitrary & Unreasonable State Action/ASC Requirement)

158.    The allegations of paragraphs 1 through 157 are incorporated as though fully set forth herein.

159.    The ASC requirement constitutes arbitrary and unreasonable State action in violation of the Due Process Clause of the Fourteenth Amendment.

160.    As applied to the provision of medical abortion, the ASC requirement constitutes arbitrary and unreasonable State action in violation of the Due Process Clause of the Fourteenth Amendment.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment that the admitting privileges requirement is unconstitutional and unenforceable:

      a.    as applied to the McAllen clinic; and/or

      b.    as applied to the provision of medical abortion at the McAllen clinic; and/or

      c.    as applied to the El Paso clinic; and/or

      d.    as applied to the provision of medical abortion at the El Paso clinic; and/or

B.    Issue a declaratory judgment that the ASC requirement is unconstitutional and unenforceable:

      a.   on its face; and/or

      b.   as applied to the provision of medical abortion; and/or

      c.   as applied to the McAllen clinic; and/or

      d.   as applied to the El Paso clinic; and/or

C.   Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing the admitting privileges requirement:

      a.   as applied to the McAllen clinic; and/or

      b.   as applied to the provision of medical abortion at the McAllen clinic; and/or

      c.   as applied to the El Paso Clinic; and/or

      d.   as applied to the provision of medical abortion at the El Paso clinic; and/or

D.   Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing the ASC requirement:

      a.   on its face; and/or

      b.   as applied to the provision of medical abortion; and/or

      c.   as applied to the McAllen clinic; and/or

      d.   as applied to the El Paso clinic; and/or

E.   Grant Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. § 1988; and/or

F.   Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated:  April 2, 2014

Respectfully submitted,

w/ PERMISSION

Stephanie Toti*
Esha Bhandari*
Natasha Lycia Ora Bannan*
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
stoti@reprorights.org
ebhandari@reprorights.org
nbannan@reprorights.org

*Attorneys for Plaintiffs*

*Application for admission forthcoming